UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
CHAYA SHUSTERMAN and ELIEZER LEVER,

                     Appellants,

             -against-

ZEV CADANER and VILMA LOUISE JOHNSON,

                     Appellees.
--------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
25-CV-04520 (OEM)

ORELIA E. MERCHANT, United States District Judge:

On August 13, 2025, Appellant-Creditors Chaya Shusterman ("Shusterman") and Eliezer Lever ("Lever") (collectively, "Appellants") appealed a June 13, 2025, memorandum decision and August 6, 2026, order and judgment from the U.S. Bankruptcy Court. *See* Notice of Appeal and Statement of Election at 3-41, Dkt. 1 (the "June 13 Order"). That order concerned the purchase of Appellee-Debtor Vilma Louise Johnson's ("Johnson") real property, located at 1708 President Street, Brooklyn, New York (the "Property"), and held that Appellants' contract with Johnson to purchase the Property was not enforceable.

Appellants ask this Court to reverse the June 13 Order and order specific performance of Appellants' contract with Johnson. *See generally* Brief for Defendants-Appellants Eliezer Lever and Chaya Shusterman, Dkt. 4 ("Appellants' Brief" or "App. Br."). Johnson and Appellee-Creditor, Zev Cadaner ("Cadaner"), (collectively, "Appellees") argue that the June 13 Order is entitled to deference and urge the Court affirm its findings. *See generally* Brief of Defendant-Appellee Vilma Johnson, Dkt. 6 ("Johnson Opposition Brief" or "Johnson Opp. Br."); Plaintiff/Appellee Cadaner's Brief, Dkt. 5 ("Cadaner Opposition Brief" or "Cadaner Opp. Br."). For the following reasons, the June 13 Order is affirmed, and the appeal is dismissed.

1

## RELEVANT BACKGROUND

### A. Real Property Contracts

#### 1. Lever Contract

In August 2020, Johnson contracted to sell Lever the Property (the "Lever Contract"). R. at 744-61.[1] Lever agreed to pay $1,200,000 for the Property with a $120,000 downpayment. *Id.* at 745. The Lever Contract provided for closing on or about November 10, 2020, *id.* at 747, and did not provide that "time is of the essence." The Lever Contract states that:

> If at Closing, there are other liens or encumbrances that Seller is obligated to pay or discharge, Seller may use any portion of the cash balance of the purchase price to pay or discharge them, provided Seller shall simultaneously deliver to Purchaser at Closing instruments in recordable form and sufficient to satisfy such liens or encumbrances of record, together with the cost of recording or filing said instruments. As an alternative Seller may deposit sufficient monies with the title insurance company employed by Purchaser acceptable to and required by it to assure their discharge, but only if the title insurance company will insure Purchaser's title clear of the matter or insure against their enforcement out of the Premises and will insure Purchaser's Institutional Lender clear of such matters. Upon reasonable prior notice (by telephone or otherwise), Purchaser shall provide separate certified or official bank checks as requested to assist in clearing up these matters.

*Id.* at 748 (quoting Lever Contract ¶ 20). The Lever Contract further provides:

> (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued . . . as to lands, housing, building, fire, health, environmental and labor conditions affecting the Premises. The Premises shall be conveyed free of them at Closing. Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.
>
> (b) . . . All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

*Id.* at 747 (quoting Lever Contract ¶ 10).

---

[1] Appellants and Johnson filed their own appendices with their briefs that differ in pagination. For the sake of clarity, the Court refers to the bankruptcy appeal record. *See* Bankruptcy Record, Dkt. 2 (the "Record" or "R."). All page numbers cited in the Record refer to the Bates stamp in blue at the bottom right corner of each page.

The Lever Contract subjects Lever to a "mortgage commitment contingency" (the "Mortgage Contingency") that provides:

> (a) The obligation of the Purchaser to purchase under this contract is conditioned upon issuance, on or before 60 days after a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in paragraph 25 or overnight mail (the "Commitment Date"), of a written commitment from an Institutional Lender . . . of $960,000 for a term of at least 25-30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment").
>
> . . . .
>
> (e) If no Commitment is issued by the Institutional Lender on or before the Commitment Date, then . . . Purchaser may cancel this contract by giving Notice to Seller within 5 business days after the Commitment Date, provided that Purchaser has complied with all its obligations under this paragraph.
>
> (f) If this contract is canceled by Purchaser pursuant to subparagraphs [A]R7(d) or (e), neither party shall thereafter have any further rights against, or obligations or liabilities to the other by reason of this contract, except that the Downpayment shall be promptly refunded to Purchaser.

*Id.* at 754-55 (quoting Lever Contract ¶ AR7).  Paragraph 25 of the Lever Contract states that "[a]ny notice or other communication ('Notice') shall be in writing and either (a) sent by either of the parties hereto or by their respective attorneys . . . by registered or certified mail, postage prepaid, or (b) delivered in person or by overnight courier" ("Paragraph 25").  *Id.* at 748 (quoting Lever Contract ¶ 25).  Lever's attorney, Philip Lavender ("Lavender"), did not know the purpose of this paragraph but acknowledged that the parties had agreed to those terms.  *Id.* at 253.  For the purposes of the Mortgage Contingency, Lever "shall be deemed to have been given a fully executed copy of this contract on the third business day following the date of ordinary or regular mailing, postage prepaid."  *Id.* at 756.

Furthermore, the Notes on Mortgage Commitment Contingency Clause section of the Lever Contract states:

> This clause allows Seller to cancel if a commitment is not accepted by Purchaser by the Commitment Date, unless Purchaser timely supplies a copy of the commitment, to allow Seller the option to avoid having to wait until the scheduled date of closing to see if Purchaser will be able to close.  Seller may prefer to cancel rather than to wait and settle for forfeiture of the downpayment if Purchaser defaults.  Because of Seller's right to cancel, Purchaser may not waive this contingency clause.  This clause means that Purchaser is subject to cancellation by Seller even if Purchaser is willing to risk that he/she will obtain the Commitment after the Commitment Date.  Some Purchasers may not want to be subject to such cancellation by Seller.

*Id.* at 751.

Johnson's attorney, Ernest Wilson ("Wilson"), emailed a fully executed copy of the Lever Contract to Lavender on August 12, 2020. *Id.* at 474-75.  Lavender received the email that same day, *id.* 207-09, 340, and upon receipt, Lever became aware that he had to apply for a mortgage, *id.* at 250.  As of October 11, 2020, sixty days after Wilson emailed the fully executed Lever Contract to Lavender, Lever had not received an unconditional mortgage commitment, and Lever had not requested an extension of time to obtain one.  *Id.* at 374.

On October 13, 2020, Lavender emailed Wilson the title report and a list of itemized conditions that needed to be resolved before closing.  *Id.* at 763-64.  The issues included: paying off the mortgage; discontinuing the *lis pendens* action relating to the foreclosure; vacating the foreclosure and sale; resolving any other judgments and liens against the record owner; paying off Environmental Control Board liens at or prior to closing; ensuring that the tenant vacated the property; removing the Department of Housing Preservation and Development violations; and removing the open permit contained in the certificate of occupancy search.  *Id*.

Between October 26, 2020, and November 30, 2020, Lavender emailed Wilson several times requesting resolution of the open title issues and requesting that Johnson consent to

assignment of the Lever Contract to Shusterman. *Id.* at 774-79.  On December 4, 2020, Lavender emailed Wilson stating that

> [O]ur client is willing to accept a credit for the reasonable cost of removing the violations from the property and closing out the open permit that exists filed against the Premises.  This is contingent on our client's lender agreeing to close subject to.  If they require to close with escrow, we will have to go that route.
>
> Speaking of the Purchaser's Lender, we will require your client to sign the attached assignment of contract from "Eli Lever" to his wife "Chaya Shusterman".  Please email a copy of the attached assignment by Mr[s]. Johnson.

*Id.* at 774-75.  Lever's interests in the Lever Contract were assigned to Shusterman by an assignment signed on December 15, 2020. *Id.* at 766-67.

In a letter dated June 30, 2021, Wilson advised Lavender that the October 12, 2020, deadline was the "Commitment Date" under the Lever Contract and that Lever had not provided notice that he applied for a mortgage or requested an extension of time to obtain the Mortgage Commitment ("TOE Letter").  *Id.* at 781-82.  Wilson asserted that time was of the essence and represented that Johnson was "ready willing and able to proceed to a closing and tender performance of her obligations under the contract of sale" declaring a closing date of July 30, 2021, at 10:00 a.m. ("Closing Date"). *Id.* 782.

Lavender responded by letter on July 2, 2021.  He rejected the TOE Letter, stating that closing was not a possibility because Johnson did not have "clean hands" for various reasons under the Lever Contract, including, *inter alia*, that Johnson had failed to "provide the Premises free of all violations as of the date of Closing"; "legalize/closeout all open permits or withdraw applications attending to such permits"; "provide 'marketable' title (not 'insurable') to the Premises; and provide "the Premises vacant, broom clean, free of tenant and occupants." *Id.* at 784-85.  Notably, Lavender rejected Johnson's asserted "Commitment Date," countering that it had not come to pass per the terms of the Lever Contract because "a copy of a fully executed

version of the Contract has not yet been delivered in a manner set forth in Paragraph 25 or by overnight mail so the time period prior to the expiration of Commitment Date has not yet beg[u]n to run." *Id.* at 784.

On July 29, 2021, Wilson sent a letter to Lavender stating that closing was set for July 30, 2021, that time was of the essence, that Johnson had "satisfied the conditions for delivery to [Lavender's] client of such marketable title," and that "the premises [would] be delivered vacant at the closing." *Id.* 787-88. Lavender responded by letter on July 30, 2021, again rejecting the time-of-the-essence assertion for failure to comply with Paragraph 25. *Id.* at 790-91. He reiterated that Lever had not waived the Mortgage Contingency and that Johnson had failed to provide a final water meter reading, remove all violations filed against the Property, and afford Shusterman an opportunity to confirm that the Property is vacant, broom clean, and free of tenants and occupants as required under the Lever Contract. *See id.*

On July 30, 2021, Johnson, Wilson, and the title closer appeared for the closing. *Id.* at 488. Wilson and Johnson were in the process of obtaining a payoff letter and had prepared the Property's deed and Automated City Register Information System ("ACRIS") documents. *Id.* at 486-88. Johnson was prepared to turn over the Property's keys and satisfy any liens or encumbrances on the Property from the sale proceeds. *Id.* Lever appeared for the closing, but Shusterman and Lavender did not appear. *Id.* at 490. Lever did not have a mortgage in place or the funds to close. *Id.* at 382-83, 376, 490.

In a letter dated August 26, 2021, Wilson stated that Lever and Shusterman's failure to close at the July 30, 2021, closing constituted a default and entitled Johnson to retain Lever's down payment as liquidated damages. *Id.* at 799-800.

6

Lever and Shusterman did not obtain an unconditional mortgage commitment; rather Lever obtained a conditional mortgage commitment from Quontic Bank for the November 10, 2020, closing, *id.* at 340-41, and when the closing was moved to 2021, he obtained a second conditional mortgage commitment from The Federal Savings Bank, *see id.* at 357-65.

### 2. Cadaner Contract

On November 12, 2020, Johnson and Cadaner contracted for Cadaner's purchase of the Property for $1,200,000. *Id.* at 806-10. A $120,000 down payment and the balance were due at closing (the "Cadaner Contract"). *Id.*

On or about August 2, 2021, Lever or Shusterman caused the assignment of Lever's interests in the Lever Contract to Shusterman to be filed with the Kings County Clerk. *See id.* at 712-13. Cadaner's attorney, Siamak Darouvar ("Darouvar"), was thereby put on inquiry notice of the Lever Contract's assignment. *Id.* at 135.

### B. Procedural History

### 1. State Court Proceeding

On November 8, 2021, Cadaner filed an action in New York Supreme Court, Kings County, against Johnson, Lever, and Shusterman seeking declaratory judgment that the Cadaner contract is in full force and effect, for specific performance, for damages, for return of the down payment, and for tortious interference with contract as to Lever and Shusterman. App. Br. at 7; *see Zev M. Cadaner v. Vilma Johnson, Chaya Shusterman, Eliezer Lever*, Index No. 528557/2021 ("State Court Proceeding"); R. at 701-02. There, Lever and Shusterman asserted cross claims against Johnson seeking declaratory judgment that the Lever Contract is in full force and effect, specific performance and damages, and counterclaims against Cadaner. *Id.* at 17-25.

7

### 2. Bankruptcy Court Proceeding

On May 20, 2022, after commencement of the State Court Proceeding, Johnson filed for Chapter 13 bankruptcy in the Eastern District of New York. R. at 703.[2]

On August 31, 2022, Johnson removed the State Court Proceeding to the Bankruptcy Court. *Id.* at 703. The Bankruptcy Court conducted trial on May 30, 2024; June 10, 2024; and September 19, 2024. On June 13, 2025, the Bankruptcy Court issued its findings of fact and conclusions of law by memorandum decision. *See generally id.* at 697-732. On August 6, 2025, the Bankruptcy Court issued its order and judgment. *See generally id.* at 694-96.

### 3. Appeal

On August 13, 2025, Appellants appealed the June 13 Order. *See generally* Appeal.

Appellants subsequently learned that Johnson had filed a fourth amended Chapter 13 plan, which contemplated a sale of the Property to Cadaner and a rejection of the Lever Contract. *See* Declaration of Ira Kleiman ¶ 22, Dkt. 8-1 ("Motion for Stay" or "Stay Mot."). A hearing on confirmation of that plan was scheduled for November 20, 2025. *Id.*

On October 21, 2025, Appellants filed a motion for a stay of the Bankruptcy Court's Order and Judgment in the Bankruptcy Court pending the instant appeal. *Id.* ¶ 23.

On November 19, 2025, Lever and Shusterman also filed a motion in this Court for an emergency stay of the Order and Judgment and "all further Bankruptcy Court proceedings" pending the appeal. *Id.* ¶ 1.

The Bankruptcy Court heard argument on Appellants' initial motion for a stay on November 18, 2025. Stay Mot. ¶ 24. It denied the motion reasoning that Johnson "had the right

---

[2] The Court takes judicial notice of the bankruptcy proceeding, *In re Johnson*, 1-22-41100-JMM (Bankr. E.D.N.Y. May 20, 2022), Dkt. 1, under Federal Rule of Evidence 201. *See Twentieth Century Fox Film Corp. v. Marvel Enters.*, 220 F. Supp. 2d 289, 293 n.4 (S.D.N.Y. 2002).

to reject the Lever Contract, and that the Appellants were really seeking money damages which could otherwise be dealt with after confirmation, and which in any event were not a reason to grant a stay." *Id.*

On November 20, 2025, this Court ordered Appellees to respond to the second motion for a stay. It additionally directed the parties to file a joint letter status report regarding the bankruptcy proceedings and set a date for a conference on the motion. In their joint letter, filed the following day, the parties represented that the confirmation hearing was adjourned to January 15, 2026, and the motion for sale was filed with a return date of December 16, 2025. Joint Letter to the Court, Dkt. 10 (Nov. 21, 2025). The parties acknowledged that these developments made the second motion for a stay "less of an 'emergency[.]'" *Id.* Thus, the Court cancelled the conference.

On December 9, 2025, Appellants renewed their request for a stay on an emergency basis, stating that the return date for the motion for sale had been "moved up" from December 16, 2025, to December 11, 2025. *See* Emergency Motion for a Stay Pending Appeal, Dkt. 13.

On December 11, 2025, the Court denied Appellants' Motion for Stay. *See* Order, Dkt. 14.

## LEGAL STANDARD

"District courts have appellate jurisdiction over final judgments, orders, and decrees entered in bankruptcy court." *Satti v. Nechadim Corp.*, 17-CV-683 (MKB), 2018 WL 1010206, at *3 (E.D.N.Y. Feb. 16, 2018). A bankruptcy court's order is final "if it completely resolves all of the issues pertaining to a discrete claim, including issues as to the proper relief." *In re Pegasus Agency, Inc.*, 101 F.3d 882, 885 (2d Cir. 1996). A district court reviews a bankruptcy court's legal conclusions *de novo* and reviews factual findings for clear error. *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000). One basis for clear error is that a court "overlooked[] matters . . . that might reasonably be expected to alter the conclusion reached by the court."

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). However, "clear error exists only when a reviewing court is 'left with the definite and firm conviction that a mistake has been committed.'" *In re Zubair*, 20-CV-8829 (VB) & 21-CV-4222 (VB), 2021 WL 4974811, at \*5 (S.D.N.Y. Oct. 26, 2021) (quoting *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir. 1990)).

The standard of review for a mixed question depends on "whether answering it entails primarily legal or factual work." *U.S. Bank Nat'l Ass'n ex rel. CWCap. Asset Mgmt. LLC v. Vill. at Lakeridge*, *LLC*, 583 U.S. 387, 396 (2018). Mixed questions of fact and law are generally subject to *de novo* review. *In re Vebeliunas*, 332 F.3d 85, 90 (2d Cir. 2003). A mixed question of law asks whether "the historical facts . . . satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982).

## DISCUSSION

### A. Whether the Bankruptcy Court Clearly Erred in Finding that Johnson was Ready, Willing, and Able to Close

Appellants argue that the Bankruptcy Court erred by ruling that Johnson was ready, willing, and able to perform on the Closing Date. App. Br. at 12. The Court reviews the Bankruptcy Court's finding that Johnson was ready, willing, and able to perform on the Closing Date for clear error.

Appellants argue that the Bankruptcy Court inaccurately restated Appellants' position because it did not acknowledge Appellants' argument that Johnson "was not ready willing and able to close, as she had failed to vacate the premises in accordance with the terms of the Lever Contract." App. Br. at 13. Appellants argue that the Lever Contract specified that the Property was to be delivered vacant and broom clean at the time of closing, *id.* (citing R. at 747), but the

10

Property was not broom clean because it was undisputed that Johnson was still living in the Property at the time of the Closing Date, and the yard area was full of debris and tires, *id*.

The Bankruptcy Court acknowledged Appellants' position that they were not required to close by the Closing Date because "(a) the Commitment Date had not expired, and (b) Johnson was not an able seller due to her failure to cure title defects." R. at 674 (citations omitted). It noted that the Lever Contract required that the Property be delivered vacant and broom clean. *Id.* at 667-78. Nevertheless, the Bankruptcy Court concluded that Johnson proved "by a preponderance of the evidence that she was ready, willing, and able to close on July 30, 2021." *Id.* at 677. Moreover, the Bankruptcy Court found that "Lever did not have a lawful excuse to close" and offered to close notwithstanding certain outstanding violations." *Id.* at 677-78.

These findings directly contradict Appellants' argument Johnson was not "ready, willing, and able." Thus, even if the June 13 Order did not expressly restate Appellants' argument that the Property was not vacant and broom swept, doing so is not reasonably expected to alter the conclusion. Because Appellants failed to appear for the closing, they did not give Johnson the opportunity to perform. Accordingly, the Bankruptcy Court squarely concluded that Johnson had proven that she was ready, willing, and able to proceed with the sale, notwithstanding any inadequacies with the Lever Contract conditions.

The record supports a finding that the Property was vacant and broom swept. The June 13 Order relied on Wilson's testimony at trial that Johnson had prepared the Property's deed, ACRIS documents, and was prepared to turn over the Property's keys and satisfy any liens or encumbrances on the Property from the sale proceeds as support for its finding that Johnson was ready, willing, and able to perform. *Id.* at 712. While not noted as a finding of fact in the June 13 Order, the Court acknowledges that Wilson's testimony also confirmed that Johnson had obtained

11

a dumpster and removed all debris and tires to ensure the Property would be delivered vacant and broom clean for closing.  *See id.* at 486-87.

Moreover, "[w]here the bankruptcy court was able to view firsthand the actions and statements of the parties and based its decision on sound legal principles, a reviewing court 'should not substitute its judgment for that of the bankruptcy court,' in the absence of a finding of abuse of discretion." *In re White*, 3:24-cv-442(AWT), 2024 WL 4850199, at *3 (D. Conn. Nov. 21, 2024) (quoting *In re Casse*, 198 F.3d 327, 341 (2d Cir. 1999)); *see also In re Pisculli*, 426 B.R. 52, 59 (E.D.N.Y. 2010), *aff'd*, 408 F. App'x 477 (2d Cir. 2011).  Here, the Bankruptcy Court made the requisite findings of fact, weighed the credibility of the evidence, and, on that basis, formed its opinion.  Upon review of the record, there is no clear error in the Bankruptcy Court's finding that Johnson was ready, willing, and able to close on the Closing Date.  The Court declines to disturb its finding.  Accordingly, the Bankruptcy Court's finding that Johnson was ready, willing, and able to close on the Closing Date is affirmed.

### B. Whether the Liens on the Property, Violations, and Encumbrances Did Not Have to Be Cleared Prior to Closing

Appellants argue that the Bankruptcy Court erred in concluding that the Lever Contract "does not appear to require that the liens, violations and encumbrances be cleared prior to its closing," R. at 721, because the Lever Contract requires that the seller convey marketable title, App. Br. at 15.  Appellants assert that for Johnson to declare time of the essence she had to be prepared to convey marketable title and, because there were a "litany of open items," she could not do so. App. Br. at 16.  The issue for the Court is whether the Lever Contract requires that liens, violations, and encumbrances be cleared *prior to* closing and whether Johnson's representation that such impairments would be resolved at closing prohibited her from delivering "marketable title" at the Closing Date.  This is a mixed issue of law and fact subject to *de novo* review.

12

Johnson argues that the Bankruptcy Court appropriately found that she was ready, willing, and able to convey marketable title and that Lever's own default caused the failed closing. Johnson Opp. Br. at 24. She contends that the Lever Contract ¶¶ 10 and 20 required her to deliver marketable title at closing, not prior, and that the Lever Contract "expressly permitted [her] to satisfy liens, violations, and encumbrances from the closing proceeds." *Id.* at 25; *see also* R. at 747-48 (authorizing the Seller to convey the Property free of conditions affecting the premises at closing and to use the purchase price to remove encumbrances).

Under New York law, "[t]he test of the marketability of a title is 'whether there is an objection thereto such as would interfere with a sale or with the market value of the property.'" *Voorheesville Rod & Gun Club, Inc. v. E.W. Tompkins Co. Inc.*, 626 N.E.2d 917, 920 (N.Y. 1993) (quoting *Reagan v. Lanze*, 354 N.E.2d 818, 822 (N.Y. 1976)). "[I]n the absence of a stipulation to the contrary, it is presumed that a marketable title is to be conveyed." *Id.* "The test of whether a title is marketable is whether the purchaser can peacefully enjoy and use the property for his intended and announced purposes." *DeJohn v. Mandelbaum,* 505 N.Y.S.2d 659, 661 (2d Dep't 1986). Contrary to Appellants' position that marketability requires so-called "pristine title," App. Br. at 15, "[m]arketability does not assure a buyer title free from every doubt, or even every encroachment. Rather, it shields the buyer from defects in title that are more than simply possible or very remote." *In re Ilana Realty, Inc.*, 154 B.R. 21, 25 (S.D.N.Y. Mar. 15, 1993) (citing *Reagan*, 354 N.E.2d at 822).

Although the Lever Contract provides that the Property shall be conveyed free of violations, encumbrances, and liens at closing, R. at 747, it also states that the "Seller may use any portion of the cash balance or purchase price to sell or discharge them," *id.* at 748. Thus, liens, violations, and encumbrances could be cleared at closing without running afoul of the contract or

the delivery of marketable title. Additionally, Lavender testified that most outstanding items, including the mortgage, judgment of foreclosure and sale, parking tickets, Environmental Control Board liens could be resolved at closing and that the Department of Housing Preservation and Development violations and open permits could be addressed through escrow funds after closing. *Id.* at 255-61. The Record also demonstrates that Johnson had ordered a mortgage payoff letter, had the deed and transfer documents prepared, and was prepared to turn over vacant possession and the keys on the Closing Date. *Id.* at 486-88.

Based on the foregoing, Appellants' enjoyment of title would not be obscured by the purported title defects at the time of the Closing Date because the defects were either in the process of being resolved or would be resolved upon closing. Both outcomes were expressly contemplated by the Lever Contract. Therefore, the Bankruptcy Court's decision that the Property liens, violations, and encumbrances did not have to be cleared prior to closing is affirmed.

### C. Whether the Mortgage Contingency Was Triggered

Appellants argue that the Bankruptcy Court erroneously "reformed" the Lever Contract by ruling that delivery of the Lever Contract by email triggered the Mortgage Contingency because it was contrary to the terms of the Lever Contract. App. Br. at 17-18. Appellants further argue that the Bankruptcy Court erred in determining that Appellants were not prejudiced by Johnson's delivery of the Lever Contract by email. *Id.* at 20-21. The two issues for the Court are (1) whether Johnson's delivery of the fully executed Lever Contract via email triggered the Mortgage Contingency despite noncompliance with Paragraph 25 and (2) if the Mortgage Contingency was triggered, whether the deviation from Paragraph 25 prejudices Appellants.

"Under New York law, 'strict compliance with contractual notice provisions need not be enforced where the adversary party does not claim the absence of actual notice or prejudice by the deviation.'" *Schweizer v. Sikorsky Aircraft Corp.*, 634 Fed. App'x 827, 829 (2d Cir. 2015) (quoting

*Fortune Limousine Serv., Inc. v. Nextel Comm'cns*, 826 N.Y.S.2d 392, 395 (2d Dep't 2006)); *see also Dellicarri v. Hirschfeld*, 619 N.Y.S.2d 816, 817 (3d Dep't 1994) ("Strict compliance with the contract's notice provisions was not required, for defendants do not claim that they did not receive actual notice or that they were in any way prejudiced as a result of this minimal deviation."); *Iskalo Elec. Tower LLC v. Stantec Consulting Servs., Inc.*, 916 N.Y.S.2d 373, 373-75 (4th Dep't 2010) (finding effective notice where notice was sent to corporate counsel, rather than the chief executive officer as was required by the contract, and where no prejudice was asserted); *Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp. 3d 497, 509-11 (S.D.N.Y. 2015), *aff'd*, 675 Fed. App'x 31 (2d Cir. 2017) (finding that termination notice, while delivered to incorrect address, was nonetheless effective because the adverse party had actual notice and did not allege prejudice); *Gorey v. Allion Healthcare Inc.*, 18346–2004, 2008 WL 183721, at *6 (N.Y. Sup. Ct. Jan. 7, 2008) (finding notice effective and "in no way prejudic[ial]" where an employee hand-delivered notice to the chief executive officer's desk and emailed him rather than mailing notice as was required by the contract). Where a party claims that no notice was ever received, by contrast, enforcement of contractual notice provisions may be proper.

Per the Mortgage Contingency, Appellants had sixty days after "a fully executed copy of this contract is given to Purchaser or Purchaser's attorney in the manner set forth in Paragraph 25 or overnight mail (the 'Commitment Date')," to secure an unconditional mortgage commitment. R. at 754. Paragraph 25 of the Lever Contract states in relevant part that notices shall be sent to the parties or their attorneys by registered or certified mail or delivered in person by overnight courier with receipt acknowledged. *Id.* at 748. Although Wilson delivered the fully executed contract to Lavender by email on August 12, 2020, Lavender testified that upon receipt of the fully executed contract from Wilson, Lever was aware that he had to apply for a mortgage. *Id.* at 250.

15

Regardless, on October 11, 2020, sixty days after Lavender's receipt of the fully executed contract via email, Lever had not met the conditions of the Mortgage Contingency by securing an unconditional mortgage commitment or, at least, requesting an extension of time to do so. Furthermore, Lever had already taken steps to secure two mortgages, despite his contention that the Mortgage Contingency was not yet triggered. *Id.* at 340-41, 357-65.

Appellants rely on the two letters transmitted by Lavender to Wilson, long after the Commitment Date and only after Johnson sought to enforce the Closing Date, to assert that Appellants had not waived the Mortgage Contingency by failing to timely obtain a mortgage commitment because the fully executed contract was not mailed in accordance with the Lever Contract Paragraph 25 notice terms. *See* App. Br. at 18 (referring to Lavender's July 2, 2021, letter, R. at 784-85, and July 30, 2021, letter, *id.* at 790-91). Appellants do not claim that no notice was received or that they did not receive actual notice. Instead, Appellants try to capitalize on the technical language of the Lever Contract although Appellants' counsel acknowledged receipt of the fully executed contract via email and thereafter investigated mortgage options.

Appellants urge that they were prejudiced by the Bankruptcy Court effectively "reforming" the Lever Contract. App. Br. at 19-21. Appellants do not identify in what way the purported reformation of the Lever Contract prejudices them beyond asserting that written agreements should be construed in accordance with the parties' intent. *Id.* (citing *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 717 (N.Y. 1995); *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004); *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013)). While that may be true, deviations from the written contract are still permissible. *See Schweizer*, 634 F. App'x at 829; *Fortune Limousine Serv., Inc.*, 826 N.Y.S.2d at 395.

16

Because the Mortgage Contingency was triggered and Appellants did not perform on the Closing Date, nor were they ready, willing, and able to, Appellants cannot seek specific performance of the Lever Contract. *See Fridman v. Kucher*, 826 N.Y.S.2d 104, 106 (2d Dep't 2006) ("A purchaser who seeks specific performance of a contract of the sale of real property must demonstrate that he or she was ready, willing, and able to perform the contract, regardless of any anticipatory breach by a seller.").

Accordingly, the Court affirms the Bankruptcy Court's decision that the Mortgage Contingency was triggered on August 12, 2020, because Appellants had actual notice of the Lever Contract and were not prejudiced. As such, the Bankruptcy Court appropriately held Appellants in default. Appellants' requests for specific performance and declaratory judgment, App. Br. at 21, are denied.

### D. Whether the "First in Time" Doctrine or Business Judgment Rule Support Enforcement of the Lever Contract

Appellants argue that given the existence of two enforceable contracts—the Lever Contract and Cadaner Contract—the "first in time" doctrine set forth in Comment 'a' of the Restatement of Contracts 2d § 146, should govern, and the Lever Contract deserves priority. App. Br. at 22. Appellants further contend that application of the "business judgment" standard favors permitting Johnson to assume the Lever Contract. App. Br. at 23-24. As set forth above, however, the Lever Contract is not enforceable. Consequently, the Court does not reach the application of priority principles and the business judgment rule.

17

**CONCLUSION**

For the foregoing reasons, the June 13 Order is affirmed, and Appellants' appeal is dismissed.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

/s/
ORELIA E. MERCHANT
United States District Judge

February 4, 2026
Brooklyn, New York

18